STATE OF NEBRASKA, APPELLEE, V.
REGINA RATHJEN, APPELLANT.

662 N.W.2d 591

Filed June 6, 2003.   No. S-02-050.

Kirk E. Naylor, Jr., for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

The Legislature has determined as a matter of public policy:

[A]n inmate who has been released on parole . . . shall be prohibited from acting as an undercover agent or employee of any law enforcement agency of the state or any political subdivision. Any evidence derived in violation of this [statute] shall not be admissible against any person in any proceeding whatsoever.

Neb. Rev. Stat. § 29-2262.01 (Reissue 1995).

Regina Rathjen was arrested, tried, and convicted pursuant to a jury verdict on charges of conspiracy to commit first degree murder, possession of methamphetamine, and possession of a defaced firearm. Before the trial, Rathjen filed a motion to suppress, alleging that most of the evidence against her was unlawfully derived from state or local agency use of a parolee as an undercover agent

in violation of Nebraska law. After a suppression hearing, the trial court denied the motion, determining that the parolee was an undercover agent of the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) agency, not of the state and local agencies working with the ATF. At trial, the objection to the admission of the evidence was renewed, and Rathjen now appeals her conviction on this ground.

The question presented is whether a state agency can circumvent the law forbidding state and local agencies from using parolees as undercover agents by enlisting a federal agency to direct the parolee while the state agency remains a prominent participant in the investigation. We conclude that the State cannot do so and reverse the judgment of convictions, vacate the sentences, and remand the cause to the district court for a new trial.

## FACTUAL BACKGROUND

On November 30, 2000, York Police Department (YPD) Sgt. Norman Cobb telephoned J.W. to inform her of something in a matter unrelated to these proceedings. Cobb knew that J.W. was on parole at the time of the telephone call. Cobb called only to relay information to J.W. and not to solicit information from her. However, during that conversation, J.W. told Cobb that an acquaintance named "Rathjen" had contacted J.W. about getting a handgun in order to harm a person Rathjen believed to be a drug informant who had given Rathjen's name to the police. Cobb told J.W. to keep him informed. Cobb then contacted Sgt. Glenn Elwell of the Nebraska State Patrol (NSP) to gain the benefit of his expertise in the area.

On December 1, 2000, Cobb happened to be at the county courthouse at the same time as J.W. During this chance meeting, J.W. told Cobb of Rathjen's continuing desire to acquire a gun from J.W. On December 3, Cobb taped a statement from J.W., and on December 4, J.W. read and signed a written transcript of the statement. This was standard operating procedure. At this meeting on December 4, J.W. told Cobb that she had again been contacted by Rathjen to acquire a gun with the explicit intention of using it to kill the person who had "narc'd" on Rathjen.

That same day, Cobb again discussed the issue with Elwell. Cobb and Elwell discussed the statute which forbids state

agencies from using parolees as undercover agents. Elwell indicated that he could contact Mickey Leadingham, an ATF agent, to seek his cooperation in the case. Upon the request, Leadingham obtained authority from the U.S. Attorney's office to open a federal investigation. Such cooperation is not unusual, as Leadingham testified that 80 percent of his time is spent working with state and local authorities.

A law enforcement officer's meeting took place on December 6, 2000, in York, Nebraska, attended by Elwell, Leadingham, J.W., and J.W.'s parole officer, among others. At the meeting, Leadingham asked J.W. if she was willing to surreptitiously record her conversation with Rathjen. She agreed to do so. Leadingham instructed her to communicate only to him, with the exception being that in an emergency, she could contact Cobb or Elwell if she could not reach Leadingham. On December 20, J.W. did call Cobb, but the reason for the call was to find and communicate with Leadingham.

At this December 6, 2000, meeting, it was decided to attempt to record a conversation between Rathjen and J.W. at their place of employment. The purpose of the conversation was to set up a rendezvous between Rathjen and Leadingham. J.W. was fitted with one of the NSP's recording devices because Leadingham had misplaced his. The microphone was supplied by Leadingham. The device was both secured to J.W.'s body and removed after the encounter with Rathjen by J.W.'s parole officer, who was the only female in the group apart from J.W. herself. Leadingham assigned various tasks to the officers present. After the plan was made, Elwell advised J.W. on the surveillance plan, saying, "What we're gonna do is we're gonna let you get in your truck and just go ahead, drive. Start that way, and we'll wait a little bit. Then we'll pull out and we'll follow you." The meeting went as planned, and J.W. told Rathjen of her friend "Mickey," a supposed Texan who could get a gun for her. Leadingham received the recording and the wire from the parole officer. A meeting between Rathjen and Leadingham was set up for January 7, 2001. The NSP also provided surveillance assistance for this rendezvous.

However, this January 7, 2001, meeting failed. Rathjen did not keep the appointment to meet with Leadingham at the pre-arranged location. J.W. then told Leadingham that her parole

officer withdrew approval of J.W.'s involvement in the case. Leadingham then asked Elwell to confirm this, which he did. J.W. supplied no more undercover assistance. Leadingham, assuming the cover identity of J.W.'s gun-supplying friend "Mickey," contacted Rathjen directly and set up another meeting for January 11. Elwell suggested bringing methamphetamine, and Leadingham agreed. The contraband was supplied by the NSP. The defaced firearm was also supplied by the NSP, as was the video recorder used in the operation. Officers from the NSP, the YPD, and the ATF assisted in the sting, which resulted in the arrest of Rathjen. Elwell did not direct this sting operation, and in fact, Elwell had only about 24 hours' notice of the January 11 sting. The sting went as planned and resulted in the arrest of Rathjen and substantial amounts of incriminating evidence.

After the arrest, Leadingham gave J.W. $200 from the ATF funds for her cooperation. J.W.'s truck and trailer were subsequently burned out, ostensibly in retaliation for her cooperation, which motivated an investigator to give Leadingham $500 out of the NSP's Rural Apprehension Program drug task force fund to give to J.W. Cobb requested that the local Crimestoppers board give J.W. some funds as well, and she received $1,000 from that source.

## PROCEDURAL BACKGROUND

On February 7, 2001, Rathjen was charged by information with three counts: conspiracy to commit first degree murder, possession of methamphetamine, and possession of a defaced firearm. Rathjen filed a motion to suppress on June 14. The district court held a suppression hearing and, in a written order dated October 17, denied the motion. A trial commenced, resulting in a jury verdict of guilty on all counts. The district court adjudged Rathjen guilty and, on December 17, sentenced her to terms of imprisonment of 12 to 15 years for conspiracy to commit first degree murder, 3 to 5 years for possession of methamphetamine with intent to distribute, and 20 months to 5 years for possession of a defaced firearm. The sentences for conspiracy to commit first degree murder and possession of a defaced firearm were to be served concurrently, while the sentence for possession of methamphetamine with intent to distribute was ordered to be served consecutive to

the sentence for conspiracy to commit first degree murder. Rathjen timely appealed.

## ASSIGNMENT OF ERROR

Rathjen assigns, restated, that the district court erred by determining that the use of a parolee in her case was not a violation of § 29-2262.01 and that as a result, the district court improperly admitted evidence developed as a direct result of the unlawful use of the parolee.

## STANDARD OF REVIEW

■ When reviewing a trial court's ruling on a motion to suppress evidence, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002).

■ To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *State v. Baker*, 264 Neb. 867, 652 N.W.2d 612 (2002).

## ANALYSIS

The question before the court is whether J.W. was acting as an "undercover agent" of any state or local law enforcement agency when she cooperated with the investigation of Rathjen in December 2000 and January 2001. Section 29-2262.01 provides:

A person placed on probation by a court of the State of Nebraska, an inmate of any jail or correctional or penal facility, or an inmate who has been released on parole, probation, or work release shall be prohibited from acting as an undercover agent or employee of any law enforcement agency of the state or any political subdivision. Any evidence derived in violation of this section shall not be admissible against any person in any proceeding whatsoever.

It is undisputed that J.W. was a parolee during her cooperation with this investigation. Furthermore, J.W. clearly acted as an undercover agent of law enforcement when she arranged meetings with Rathjen, pretended to cooperate with Rathjen's criminal

plan, wore a hidden recording device, and played a crucial part in setting up the eventual sting operation, all at the behest and direction of law enforcement officials. The only question before us is whether J.W. was acting as an agent for state and local law enforcement agencies when she participated in the sting operation.

We determine that the question whether a probationer, inmate, or parolee is acting as an undercover agent of state or local agencies is a mixed one of law and fact. In the first instance, we must interpret the meaning of § 29-2262.01. This interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Baker, supra.* In construing § 29-2262.01, we must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose. *In re Interest of DeWayne G. and Devon G.,* 263 Neb. 43, 638 N.W.2d 510 (2002). After independently placing a reasonable construction on the statute, we then review the district court's findings of fact. The facts in this case are not largely in dispute. Therefore, we analyze these relatively undisputed facts to determine, independently, whether the involvement of a state or local agency rises to the level which indicates that J.W. was acting as an undercover agent for it during the course of the Rathjen investigation.

In construing § 29-2262.01, it is rather obvious that the Legislature, for a number of public policy reasons, did not want inmates, probationers, *or parolees* acting as undercover agents in any capacity for state or local law enforcement agencies. The issues of institutional control, public safety, and evidentiary reliability were so important that the Legislature determined that any violation of § 29-2262.01 would result in the suppression of evidence derived from a tainted undercover source. Thus, even though § 29-2262.01 can control only the activities of state and local law enforcement officials, and not federal authorities, we will examine the activities of state and local law enforcement with the overall purpose of the statute in mind, and not place a construction that would defeat the statutory purpose in spirit or

application. When deciding whether a parolee was acting as an undercover agent of any state or local law enforcement agency, we will examine the totality of the circumstances to determine, among other things, who initiated the undercover investigation, whether a federal or outside agency was contacted by local law enforcement to continue the investigation, and the amount of cooperation or control maintained by local law enforcement in the ongoing investigation. These factors are nonexclusive, but will serve as guideposts in determining the degree of involvement that local law enforcement may have in an investigation when deciding whether the provisions of § 29-2262.01 have been violated.

When considering the totality of the circumstances in the instant case, we observe that the undercover investigation was initiated by the YPD and the NSP. Cobb, a sergeant with the YPD, by good fortune and good police work, had contact with J.W. on November 30, 2000, and initially found out that a person named "Rathjen" had contacted J.W. about getting a handgun to harm a person Rathjen believed to be a drug informant. Cobb told J.W. to keep him informed. In the meantime, Cobb contacted Elwell, a sergeant with the NSP, to gain the benefit of his expertise. At another chance meeting at the county courthouse on December 1, J.W. saw Cobb and told him of Rathjen's continuing desire to acquire a gun from J.W. On December 3, Cobb taped a statement from J.W., and the next day, J.W. read and signed a written transcript of the statement.

On December 4, 2000, Cobb again discussed the issue with Elwell. Cobb and Elwell specifically discussed § 29-2262.01, which forbids state agencies from using parolees as undercover agents. It was at this time that Elwell indicated he could contact Leadingham, an ATF agent, to seek his cooperation in the case.

A law enforcement officer's meeting took place on December 6, 2000, attended by Elwell, Leadingham, J.W., and J.W.'s parole officer, among others. At the meeting, Leadingham asked J.W. if she was willing to surreptitiously record Rathjen. She agreed. At this meeting, it was decided to attempt to record a conversation between Rathjen and J.W. at their place of employment. The purpose of the conversation was to set up a rendezvous between Rathjen and Leadingham.

Not only did the YPD and the NSP initiate the investigation and help set up the December 6, 2000, meeting among state and federal law enforcement officials in York, but it was at this time that state and local law enforcement continued their substantial cooperation in the ongoing undercover investigation. J.W. was fitted with one of the NSP's recording devices because Leadingham had misplaced his. The device was both secured to J.W.'s body and removed after the encounter with Rathjen by J.W.'s state parole officer, who was the only female in the group apart from J.W. herself. After the plan was made, Elwell advised J.W. on the surveillance plan. The initial surveillance meeting went as planned, and Leadingham received the recording and the wire from the state parole officer. A meeting between Rathjen and Leadingham was then set up for January 7, 2001. The NSP also provided surveillance assistance for this rendezvous.

In short, although Leadingham and the ATF took the lead in the Rathjen investigation on or after December 6, 2000, it was the initial contact by state and local law enforcement officers, and the ongoing cooperation of these officers, that led directly to J.W.'s role as an undercover agent for law enforcement in the present case. Under the totality of the circumstances, we conclude that both the spirit and the letter of § 29-2262.01 were violated and that J.W. was acting as an undercover agent of state and local law enforcement officers on and after December 6, 2000. Therefore, under the provisions of § 29-2262.01, the evidence derived from the use of J.W.'s undercover cooperation was inadmissible at trial. The district court erred in denying Rathjen's motion to suppress.

In its brief, the State argues that even if the district court erred, its error was harmless. However, the evidence made inadmissible by this statute is not just J.W.'s testimony, but all evidence derived from the unlawful use of J.W as an undercover agent. The statutory language, "[a]ny evidence derived in violation of this section," is a codification of the "fruit of the poisonous tree" doctrine. See, *Miles v. State*, 365 Md. 488, 781 A.2d 787 (2001); *State v. Farha*, 218 Kan. 394, 544 P.2d 341 (1975). J.W.'s unlawful role in the investigation was an indispensable link to acquiring most of the evidence used against Rathjen at trial; without J.W.'s clandestine cooperation, the January 11, 2001, sting operation would not

have occurred. The tainted evidence admitted at trial is not purged on attenuation, inevitability, or independent source grounds. The evidence has come " ' "by exploitation of [the] illegality." ' " *State v. Manning*, 263 Neb. 61, 67, 638 N.W.2d 231, 236 (2002) (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). While J.W.'s testimony of events occurring before she became an agent on December 6, 2000, is admissible, her testimony of events occurring after becoming an agent, as well as the other evidence derived directly or indirectly from her undercover work, is inadmissible. It cannot be said that the admission of this evidence did not materially influence the jury to reach a verdict adverse to the substantial rights of Rathjen. See *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000). Therefore, the district court's error was not harmless.

Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003). When considering the sufficiency of the evidence in determining whether to remand for a new trial or to dismiss, an appellate court must consider all the evidence presented by the State and admitted by the trial court irrespective of the correctness of that admission. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000). After examining the record, we conclude that the evidence admitted by the trial court would have been sufficient to sustain a conviction; thus, remand is proper.

## CONCLUSION

For the foregoing reasons, we reverse the district court's judgment of convictions, vacate the sentences imposed on Rathjen, and remand the cause for a new trial.

JUDGMENT REVERSED, SENTENCES VACATED, AND CAUSE REMANDED FOR A NEW TRIAL.