ment on Count V of his First Amended Complaint will therefore be granted.

### III. Does The Grievance Clause Contained In The Operative Collective Bargaining Agreement Require Deferral Of The Instant Matter Pending Arbitration?

In its final argument, Defendant asserts that should the Court find Plaintiff's statutory claims survive the December 18, 2000 settlement, this Court must nevertheless dismiss the claims, as the CBA at issue requires their submission to arbitration. (Defendant's Memo in Support, PP. 15–17). Upon consideration, the Court will reject this argument. In *Neppl v. Signature Flight Support Corp.*, the Minnesota District Court performed an in-depth analysis of the state of the law with respect to, "whether or not an employee subject to a collective bargaining agreement with a general arbitration clause has waived the right to bring statutory claims . . . . against his employer in federal court." *Neppl v. Signature Flight Support Corp.*, 234 F.Supp.2d 1016, 1019 (D.Minn.2002) (footnote omitted). The Minnesota Court stated as follows:

> [B]eginning with *Gardner–Denver,* the [United States Supreme] Court determined that submission of an employment discrimination claim to binding arbitration pursuant to a CBA did not preclude subsequent litigation of the same claim in federal court. . . .
>
> In *Varner v. National Super Markets, Inc.*, 94 F.3d 1209 (8th Cir.1996), the Eighth Circuit Court of Appeals followed the *Gardner–Denver* line of cases and found within the federal courts' plenary powers under Title VII a concurrent and absolute right to bring Title VII claims in the federal forum . . . . The Court also noted that Title VII has no requirement that parties exhaust grievance and arbitral remedies before bringing federal claims.

*Neppl,* 234 F.Supp.2d at 1021–22 (internal citations omitted). The *Neppl* court continued to conclude that despite the Supreme Court rulings in *Gilmer v.Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and *Wright v. Universal Maritime Service Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), *Gardner–Denver* and *Varner* remained binding precedent. *Neppl,* 234 F.Supp.2d at 1022–24. Upon consideration, this Court approves the reasoning in *Neppl,* and holds it is not required to compel arbitration of Plaintiff's statutory claims. *See Neppl,* 234 F.Supp.2d at 1025. Defendant's Motion for Summary Judgment on this point is denied.

### CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Nu–Way Service, Inc.'s Motion for Summary Judgment (Doc. No. 25) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Cross–Motion for Partial Summary Judgment (Doc. No. 28) is **GRANTED.**

**UNITED STATES of America, Plaintiff,**

v.

**Regina L. RATHJEN, Defendant.**

No. 4:03CR3096.

United States District Court, D. Nebraska.

April 15, 2004.

Alan L. Everett, Assistant United States Attorney, Lincoln, NE, for Plaintiff.

Kirk E. Naylor, Jr., Naylor Law Firm, Lincoln, NE, for Defense.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

The defendant has pled guilty to possession of a firearm that had the serial number removed from it. A presentence report has been prepared, and the defendant has lodged an objection to the report.

Despite the defendant's well-argued objection to the base offense level, I find and conclude that the probation officer was correct in setting the base offense level at 28. My reasons for that decision are briefly set forth below.

## I. BACKGROUND

### A.

In this court, Rathjen is charged with, and has admitted to, unlawful possession of a firearm that does not contain a serial number. Rathjen procured the gun from an undercover Alcohol, Tobacco and Firearms agent (ATF agent) after a state parolee was used by the federal agent and local authorities to facilitate a meeting. In state court, Rathjen was convicted of conspiracy to commit first degree murder and other related offenses, and she was sentenced to a long prison term. However, the Nebraska Supreme Court vacated the conviction because state authorities had been present during some of the investigation and they had participated in the use of a state parolee to further the investigation. According to the Nebraska Supreme Court, the parolee's involvement violated a state law that prohibited the use of parolees as undercover operatives. *See State v. Rathjen,* 266 Neb. 62, 662 N.W.2d 591 (2003) (applying state statute).

After Rathjen's state sentence was vacated, the federal government prosecuted her for the gun crime. She entered a plea of guilty, and the case was referred to the probation office for a presentence report (PSR).

The probation officer reasoned that the base offense level in this case was 28. Pertinent to the defendant's objection to the PSR, the probation officer's analysis proceeded along the following lines:

As required by the cross-reference at U.S.S.G. § 2K2.1(c)(1)(A), since the defendant used or possessed the firearm in connection with the commission or attempted commission of another offense (a state law conspiracy to commit murder), U.S.S.G. § 2X1.1 applied to the defendant's case.

U.S.S.G. § 2X1.1(c) states that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section" the court must "apply that guideline section."

U.S.S.G. § 2A1.5(a) requires that the base offense level be set at 28 for any case involving a conspiracy or solicitation to commit murder.

### B.

Although she disputes it, Rathjen obtained the gun with the intention of killing someone whom she believed had informed the police about her drug activities and was causing her problems at work. Some of the especially pertinent portions of the state trial record, where ample evidence is

presented to find and conclude that Rathjen had the present intention at the time she acquired the firearm of killing another person, and that she conspired to do so under state law, are found at: (1) government's exhibit 1 (volume II of the state trial transcript, pages 165–68, 171, 177–78, 185–187, 189, 204, 214, and 224–226) regarding the testimony of the confidential informant; (2) government's exhibit 1 (volumes II and III of the state trial transcript, pages 282, 288–289, 298–300, 303, 305, 322–323, 326–332, and 335) regarding the testimony of the undercover ATF agent; and (3) government's exhibit 2, the video tape of defendant's meeting with the ATF agent where she obtained the gun.

In particular, I find that the following facts, stated in the PSR, are generally correct, to wit:

12. At all times in question Rathjen worked at Redman Homes in York, Nebraska where J.W. was also employed. In late November 2000, local law enforcement began serving arrest warrants on a number of people in York County for violating state drug laws, including employees at Redman Homes.

13. On November 29, November 30, and December 1, 2000, Rathjen had conversations with J.W. Rathjen suspected that a particular individual, "Eddie"[1], had provided information to authorities regarding Rathjen's drug habits, and had set Rathjen up to be arrested (Rathjen had previously bought drugs from, and sold drugs to, "Eddie"). Rathjen asked J.W. if J.W. could acquire a .38 caliber handgun for Rathjen, and asked J.W. not to tell Rathjen's husband about it. Rathjen asked if J.W. could acquire a gun which couldn't be traced, a gun with no serial numbers. Rathjen stated "they're trying to arrest me, its all Eddie's fault." Rathjen stated "If I'm going to prison, I'm going all the way." Rathjen stated "I really need that gun."

14. J.W. made contact with law enforcement and told them about these conversations with Rathjen. A couple of days later (approximately December 3, 2000), Rathjen stated to J.W. "I'm gonna shoot the little mother fucker [meaning Eddie]," because she felt Eddie had set her up to be arrested.

15. J.W. thereafter met with Mickey Leadingham, an agent of the Bureau of Alcohol, Tobacco, and Firearms. Leadingham told J.W. that if Rathjen still wanted a gun, he would act in an undercover capacity as an individual with a gun to sell. J.W. thereafter, on approximately December 6, 2000, told Rathjen that the guy with the gun would be available if she still wanted the gun, and Rathjen stated she did. Rathjen stated she wanted a gun and 12 bullets: six for practice and six for "the deal". Rathjen winked and smiled at J.W., stating the gun was for her own personal use.

16. J.W. made arrangements for Rathjen to meet with Leadingham. Before this meeting could take place, Rathjen felt that Eddie had tried to contact her at her place of employment. When Rathjen told J.W. of this attempted contact, Rathjen was livid, saying "I'm gonna kill him, I'm gonna kill him." Rathjen again asked J.W. to make

---

1. "Eddie" was providing information to the local law enforcement officers about drug activities, and he had worked at defendant's place of employment. (Exhibit 1 (volume II of the state trial transcript, pages 125, 166).)

arrangements for her to acquire a gun, and also wanted to know if Leadingham might have any methamphetamine for sale.

17. Rathjen met with Leadingham (acting in an undercover capacity) in a motel room [in York, Nebraska] on January 11, 2001. This meeting was surreptitiously video taped. Rathjen stated she wanted the gun for her own personal use, but if it was used to kill Eddie, she would thereafter throw it in the river. She talked about how she might use the gun to kill Eddie, and stated that afterwards it would never surface, she would throw it into the water somewhere. Leadingham offered Rathjen two guns: one with a serial number and one without a serial number. Rathjen selected the gun without a serial number, stating "that's a throwaway." Rathjen purchased the gun and six bullets, stating she wanted six bullets "in case I miss the first five times."

18. Leadingham told Rathjen that he did have a little bit of methamphetamine available, and could front her some if she could sell it. Rathjen initially stated she would take 3/4 of an ounce and sell it, then agreed to take one ounce and to pay Leadingham $650 for it at a later time. Rathjen was arrested before leaving the motel room with the gun and the methamphetamine in her possession.

19. The gun is a Smith & Wesson .38 caliber model 36 five shot revolver on which the serial number stamped on the frame of the gun had been previously obliterated and

removed. It had been manufactured in another state.

(PSR, ¶¶ 12–19.)

## II. ANALYSIS

Before we get to the particulars of the defendant's arguments, two initial observations are in order. They will help clarify the situation, and point out what cannot be disputed. I will then address the defendant's arguments.

### A.

Even though the conspiracy to commit murder was a state offense, the Guidelines contemplate the imposition of additional punishment in such a circumstance. U.S.S.G. § 2K2.1(c)(1), comment (n. 14). Guideline commentary explicitly provides that the underlying crime "may be a ... state ... offense." *Id.*

■ Moreover, under Nebraska law, one may be guilty of a conspiracy to commit murder even though the other party to the unlawful agreement had no intention of entering into a real conspiracy. *See, e.g., State v. Tyma,* 264 Neb. 712, 651 N.W.2d 582, 591 (2002) (evidence was sufficient to establish that the defendant entered into agreements with both alleged co-conspirators to murder her husband notwithstanding the fact that both co-conspirators feigned agreement; the court stated that Nebraska has adopted "the unilateral approach to the agreement element of conspiracy" and that "[u]nder the unilateral approach, only the defendant need agree with another person; the second party can feign agreement.") (collecting cases). In other words, where two people ostensibly reach an unlawful agreement, a conspiracy under Nebraska law can be proven when only one of them actually intends to conspire to do something illegal.

## B.

With the foregoing observations in mind, I turn to the defendant's arguments. Essentially, she presents three of them.

### (1)

■ Initially, the defendant argues that the evidence does not establish that she committed a state offense of conspiracy to commit murder. In particular, the defendant argues that she never intended to kill "Eddie", and thus could never have conspired to do so. I disagree.

I have carefully reviewed the evidence, and, like the jury, I find and conclude that under Nebraska law that she was guilty of conspiracy to commit murder, and that the firearm which is the subject of this case was possessed in connection with that conspiracy. For example, the evidence showed that (1) prior to the meeting with the undercover ATF agent, there were multiple statements by the defendant, separated by days, of an intention to shoot or kill "Eddie"; (2) the defendant attempted to meet once with the undercover ATF agent to acquire a gun for that purpose, and, when that meeting failed (because the agent and the defendant did not see each other at the designated meeting place), Rathjen agreed to a second meeting where the transfer of the gun was finally accomplished; and (3) when given a choice by the undercover ATF agent, the defendant selected a gun without serial number, calling the weapon a "throwaway".

Among other things, the defendant relies upon her statement to "J.W." and again to the undercover ATF agent during the meeting at the hotel that she wanted the gun for "personal use". However, when viewed in context, those statements are of the "wink and nod" variety. The defendant also argues that she was "tweaking" from methamphetamine use, and thus she was not serious about killing anyone except, perhaps, herself. While I do not doubt that the defendant's thinking was clouded, her drug abuse makes it more likely, not less so, that she would have used the gun to kill "Eddie". In short, the evidence shows that the defendant actually intended to kill "Eddie" and she entered into an unlawful agreement under state law to accomplish that end.

### (2)

■ Regarding the fact that the defendant's state law conviction was overturned on procedural grounds (because state law enforcement officers used a state parolee as an undercover operative in violation of a state law prohibiting the use of parolees for such a purpose), I conclude that such a fact is legally irrelevant under federal law for purposes of enhancement.[2] That is, for an increase in the base offense level under section 2K2.1(c)(1)(A), federal law only requires that there be reliable evidence that makes it more probable than not that the state offense was committed and that the weapon was used or possessed in connection with that offense. Under U.S.S.G. § 2K2.1(c)(1)(A), there is no requirement that the defendant must actually have been convicted of the state offense. *United States v. Smith*, 997 F.2d 396, 397 (8th Cir.1993) ("The cross-reference provision

---

**2.** In this case, I do not need to address the far different question of whether the federal government could obtain an increased offense level if the state jury had acquitted the defendant of the underlying state crime or if the state court had determined that the evidence was insufficient as a matter of law to convict the defendant on the merits of the charge. Here, the appellate judgment in favor of the defendant did not relate to the merits, and the state jury found the defendant was guilty beyond a reasonable doubt. I note, however, that the Fifth Circuit has held that the cross-reference applies even when a jury has acquitted the defendant of the underlying offense. *United States v. Branch*, 91 F.3d 699, 742–43 (5th Cir.1996).

contains no language requiring that the defendant be convicted of the other offense.") (citing and quoting U.S.S.G. § 2K2.1(c)(1)(A).) *See also* U.S.S.G. § 2K2.1(b)(5), comment (n. 7) (defining "Felony offense" as used in section 2K2.1(b)(5) to mean any "offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, *whether or not a criminal charge was brought, or conviction obtained.*") (Emphasis added.) [3]

### (3)

■ The defendant next argues she is entitled to a three level reduction under U.S.S.G. § 2X1.1(b)(1) or (2). The most pertinent part of this Guideline to defendant's case is section 2X1.1(b)(2), and it provides as follows:

> If a conspiracy, decrease by 3 levels, unless the defendant or co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

There are two problems with the defendant's argument. First, the sections relied upon by the defendant do not apply. For conspiracies to commit murder, the cross-reference in U.S.S.G. § 2X.1.1(c) requires me to apply U.S.S.G. § 2A1.5(a), setting the base offense level at 28 for this specific type of conspiracy. Thus, as a consequence of their specificity, U.S.S.G. §§ 2X1.1(c) and 2A1.5(a) take precedence

over the more general provisions of U.S.S.G. § 2X1.1(b).

Even if U.S.S.G. § 2X1.1(b)(2) were to apply, by its terms, this section makes clear that the defendant is not entitled to a reduction when "circumstances demonstrate that the conspirators were about to complete all such acts" necessary to complete the crime, but they were frustrated in doing so by law enforcement. *Id. See also* U.S.S.G. § 2X1.1, comment (background) ("In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted.")

Here, the only thing left for the defendant to do after she selected the "throwaway" and the ATF agent handed her the weapon and the bullets, was to walk out of the motel room and find and shoot "Eddie". "Eddie" resided in or near the small community where the gun transaction took place. He had previously worked at the defendant's place of employment, and he was well known to her. Thus, the object of the conspiracy (murder) was on the "verge" of being completed when government stopped it. Accordingly, the defendant is not entitled to a 3 level reduction even if U.S.S.G. § 2X1.1(b) applied.

### III. CONCLUSION

The defendant conspired to commit a murder. At the center of the conspiracy was a gun that carried no serial number.

---

**3.** Note that U.S.S.G. § 2K2.1(b)(5) applied to the defendant as well. However, because the cross-reference found at U.S.S.G. § 2K2.1(c)(1)(A) also applied to the defendant and produced a greater offense level, by its express terms, section 2K2.1(c)(1)(A) took precedence over section 2K2.1(b)(5) for pur-

poses of computing the base offense level. Thus, reliance upon application note 7 to section 2K2.1(b)(5), and the language "whether or not a criminal charge was brought, or conviction obtained[,]" is appropriate when construing the reach of section 2K2.1(c)(1)(A).

Had the government not arrested the defendant after she took possession of the weapon, a murder (and perhaps a suicide) would likely have followed. Under these circumstances, the probation officer did not err by setting the base offense level at 28.