STATE OF NEBRASKA, APPELLEE, V.
SCOTT CLAYCAMP, APPELLANT.
714 N.W.2d 455

Filed April 18, 2006.    No. A-05-592.

David W. Jorgensen, of Nye, Hervert, Jorgensen & Watson, P.C., for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

INBODY, Chief Judge, and IRWIN and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Scott Claycamp appeals from his convictions following a jury trial for first degree assault and use of a deadly weapon to commit a felony. The trial court read its final written jury instructions, including one on self-defense but excluding its final "submission" instruction, and then permitted the parties to present closing arguments. During closing arguments, the court orally instructed the jury "not to consider any sort of [the victim's] conduct or the consequences of his conduct." We conclude that the court's oral instruction conflicted with the earlier written instruction concerning self-defense and thus constituted reversible error. We therefore reverse the judgment of the district court and remand the cause for a new trial.

## BACKGROUND

Claycamp and the victim were neighbors in Edgar, Nebraska, and the victim had formerly been married to Claycamp's sister. Claycamp and the victim had a history of confrontations. On June 13, 2004, the victim, from his own property, began yelling and screaming at Claycamp. Claycamp grabbed an ax handle, claiming that he intended to defend himself because of previous threats and assaults. A confrontation ensued on the edge of Claycamp's property where it abutted a public street in Edgar. The victim sustained multiple lacerations and fractures to his face and skull. Based on the above events, the State charged Claycamp with first degree assault and use of a deadly weapon to commit a felony.

Prior to trial, the trial court partially sustained the State's motion in limine, precluding evidence "regarding actions by law enforcement, the County Attorney's Office, or any Judge as they relate to other investigations, arrests, prosecutions, or the issuance of orders related to the victim [and] regarding any failure on the part of the State to arrest, prosecute, or incarcerate the victim."

At trial, Claycamp testified that in May 1995, he put a "no trespassing" sign on his property to keep the victim away from

Claycamp. In May 2003, Claycamp and the victim had an argument about the victim's walking across Claycamp's property. Claycamp testified that he "went down" when the victim kicked Claycamp in the crotch and that the victim then grabbed Claycamp's crotch, picked Claycamp up, and squeezed. In July 2003, Claycamp acquired a protection order against the victim. Claycamp testified that even after the protection order was granted, the victim constantly yelled at and harassed Claycamp and wanted Claycamp to fight. According to Claycamp, on some occasions the victim did so while he was on Claycamp's property.

On May 5, 2004, a deputy from the sheriff's office investigated a disturbance reported by Claycamp where the victim yelled that he was going to burn down Claycamp's house with Claycamp in it. Claycamp testified that it took the deputy approximately 1½ hours to arrive following the first telephone call to the police. After entering the victim's house, the deputy then spoke with Claycamp and told Claycamp that a fire bomb was in the victim's sink. The sheriff's office responded to another disturbance call on June 2 because the victim was yelling that he was going to "kick [Claycamp's] ass." Claycamp testified that he was afraid of the victim and did not feel safe in his home.

Claycamp testified that on the evening of June 13, 2004, the victim repeatedly yelled that he was going to "kick [Claycamp's] ass." Claycamp testified that he carried the ax handle with him to another neighbor's house to defend himself, because the victim had "beat [Claycamp] up" before and because Claycamp figured the victim would do it again. Claycamp testified that when he left the neighbor's house and was a couple of feet onto his property, the victim, while standing at the street's edge closest to Claycamp's house, stated, "come on, [expletive], cross the line." Claycamp held the ax handle up and told the victim to go home. As Claycamp turned and started to walk toward his camper, he watched the victim out of the corner of his eye and saw the victim "coming at [Claycamp]" as if the victim were going to grab him. Claycamp turned and hit the victim with the ax handle "until he stopped coming at [Claycamp]." The victim stumbled backward and fell to the ground in the street. Claycamp testified that the victim did not touch him on June 13, and Claycamp had no bruises or injuries.

The victim was taken to a hospital by "life flight" and was admitted as a category one trauma, the "highest activation level" the hospital has, due to the amount of maxillofacial injuries. The injuries were so severe that hospital staff performed a surgical procedure where a tube was inserted into the victim's trachea. The victim subsequently underwent approximately 10 hours of reconstructive surgery to his head and face. Based on the injuries, a doctor opined that the victim suffered a minimum of five blows to the head. The doctor observed no "defensive wounds" on the victim.

At the conclusion of the evidence, the trial court advised the jury that there would be a short break and that "[t]hen we're going to bring you in here, do instructions. And do the closing arguments." The bill of exceptions shows that after the break, the court told the jury:

> What's going to happen now is I'm going to read to you all of the jury instructions except for the last one. When we get done with closing arguments and you get ready to go in the jury room you will each receive a copy of it. But I'm going to ask you to pay attention as I read you the first several instructions.

A parenthetical comment follows, stating, "Instructions read to the jury at this time." The trial court's interlineations of the instructions reword instruction No. 1, "Function of Judge, Jury, and Counsel," to read in part: "[N]ow that you have heard all of the evidence and the arguments of ~~will be givn~~ counsel, *which we* [*sic*] *be shortly*, it is my duty to instruct you in the law." (Emphasis depicts interlineations.) Although it is not entirely clear from the record, it appears that the instructions concerning the elements of the offenses and the instruction concerning self-defense were given at this time. The transcript contains the instruction on self-defense, instruction No. 4, which states:

> [Claycamp] acted in self[-]defense if:
>
> (1) [The victim] threatened or attempted force that would cause death or serious bodily injury to [Claycamp]; and
>
> (2) [Claycamp] did not provoke any such use of force against him with the intent of using deadly force in response; and,

(3) Under the circumstances as they existed at the time, [Claycamp] reasonably believed that his use of deadly force was immediately necessary to protect himself against death or serious bodily harm; and,

(4) Before using deadly force [Claycamp] either tried to get away or did not try because he did not believe he could do so in complete safety.

The fact that [Claycamp] may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in response to that belief. [Claycamp] is not required to prove that he acted in self[-]defense. It is up to the State to prove that he did not.

During the State's closing argument, the special deputy county attorney contended in part:

Now, should a person have to be sitting in his house in fear? No. No. [The victim] deserved, he deserves to be punished for what he does. But it's not his trial today. The question is, the question is, did . . . Claycamp do what he could do to avoid this situation from happening?

At this point, Claycamp's counsel objected to the argument and, outside the jury's presence, made a motion for mistrial, noting:

Your ruling on the motion in limine in regard to our offer in proof and our offer in proof have been scrupulously honored by the defense. The State now has injected this issue into its closing argument, they have implied to the jury that [the victim] will have a day in court. And will be prosecuted. When the fact of the matter is known that he isn't going to be prosecuted. So the statute of limitation on some of these things has run.

The trial court, after having the official court reporter read back the pertinent argument, heard arguments of counsel, during which time the State's counsel suggested that if the court believed that there had been an improper argument, the court could admonish the jury not to consider that part of the argument. The trial court stated, "I think you skirted awfully close." The court then overruled the motion for mistrial, advising counsel that the court intended both to admonish the jury and to tell the jury "you're not to consider what, if anything, is going to happen to [the victim] as

a result of his conduct." Claycamp's counsel objected to the proposed admonishment, asserting that it compounded the error. The trial court inquired as to how defense counsel would suggest that the jury be admonished, and Claycamp's counsel responded that he did not have an admonishment and that he thought the only proper remedy would be a mistrial.

Upon returning to open court, the trial court admonished the jury as follows:

> Ladies and gentlemen, I'm going to instruct you that you're not to consider any sort of [the victim's] conduct or the consequences of his conduct. This is about the defendant . . . Claycamp. So any remarks about punishment that may have been made are not proper for you to consider. You may continue, [special deputy county attorney].

Claycamp's counsel then stated, "Judge, I'd like an exception noted to the admonishment," and the trial court so noted.

Thereafter, closing arguments resumed and both parties presented arguments to the jury as to whether Claycamp was acting in self-defense at the relevant time. At the end of the rebuttal argument, the record contains a parenthetical comment stating, "Final instruction read to the jury at this time." We assume this final instruction was instruction No. 12, entitled "Submission to the Jury."

A jury found Claycamp guilty of both counts. Prior to imposing sentence, the trial court overruled Claycamp's motion for new trial based on the motions for mistrial made during the course of the trial. The court sentenced Claycamp to 15 to 20 years' imprisonment on the first degree assault conviction and 5 to 10 years' imprisonment on the use of a deadly weapon to commit a felony conviction, said sentences to run consecutively.

Claycamp timely appeals.

## ASSIGNMENT OF ERROR

Claycamp alleges that the trial court erred in instructing the jury that it was not to consider either the victim's conduct or the consequences of his conduct.

## STANDARD OF REVIEW

■ In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned

 

instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405 (2002).

## ANALYSIS

We begin by observing that if the trial court had pronounced an admonishment in the same words suggested by the court in chambers, i.e., "I'm going to instruct [you] not to consider what, if anything, is going to happen to [the victim] as a result of his conduct," the sole issue presented by this appeal probably could have been avoided. Thus, the events of this case demonstrate that a trial court, in determining how to admonish a jury in response to an arguably improper argument, should first, outside the presence of the jury and in consultation with counsel, develop specific, clear language for the admonishment and then, upon delivering the admonishment, should utilize that precise language. In the instant case, the trial court developed such language, but then, when addressing the jury, pronounced different words as follows:

> Ladies and gentlemen, I'm going to instruct you that you're not to consider any sort of [the victim's] conduct or the consequences of his conduct. This is about the defendant . . . Claycamp. So any remarks about punishment that may have been made are not proper for you to consider. You may continue, [special deputy county attorney].

Claycamp asserts that the court's words following the overruling of his motion for mistrial amounted to a jury instruction inconsistent with its earlier instruction on self-defense and that the court thus erred in giving an erroneous jury instruction. Under the particular circumstances presented in this case, we agree that the first sentence of the court's pronouncement constituted an instruction to the jury which conflicted with the earlier written instruction on the issue of self-defense.

As the background set forth above demonstrates, we are presented with a factual scenario where the jury has been given all the formal jury instructions save the final one, and then in the midst of the State's closing argument, the court uses language "instruct[ing]" the jury "not to consider any sort of [the victim's] conduct or the consequences of his conduct."

■ The State argues that Claycamp failed to "raise or specifically object to the *content* of the admonishment." Brief for appellee at 9. We agree that during the conference in chambers, Claycamp's trial counsel argued the matter solely as one involving prosecutorial misconduct and did not object to the content of the court's proposed admonishment. However, the court's instruction to the jury significantly differed in content from the admonishment proposed in chambers. We cannot expect trial counsel to anticipate such a difference. When confronted with the different language actually pronounced, Claycamp's trial counsel immediately preserved an exception. It is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002).

■ In this appeal, Claycamp focuses on the first sentence of the oral instruction which he now contends eliminated his claim of self-defense. Although Claycamp does not cite or discuss Neb. Rev. Stat. § 25-1115 (Reissue 1995), we consider that statute as controlling in the instant case. Section 25-1115 states:

> No oral explanation of any instruction authorized by the preceding sections shall, in any case, be allowed, and any instruction or charge, or any portion of a charge or instructions, given to the jury by the court and not reduced to writing, as aforesaid, or a neglect or refusal on the part of the court to perform any duty enjoined by the preceding sections, shall be error in the trial of the case, and sufficient cause for the reversal of the judgment rendered therein.

One of those "preceding sections," Neb. Rev. Stat. § 25-1111 (Reissue 1995), imposes upon the trial judge the duty, in all cases, both civil and criminal, to reduce their charges or instructions to the jury to writing, before giving the same to the jury. Under the circumstances presented in the instant case, we consider the trial court's instruction "not to consider any sort of [the victim's] conduct or the consequences of his conduct" as a violation of § 25-1115. Under § 25-1115, the trial court's action

constitutes "error in the trial of the case, and sufficient cause for the reversal of the judgment rendered therein."

■ We recognize that this statute has not been construed so as to require a trial court to reduce to writing all the admonitions which it may be proper to give the jury while the trial is in progress. See *Grandsinger v. State*, 161 Neb. 419, 73 N.W.2d 632 (1955). In the instant case, however, the instruction was delivered after the evidence was concluded and most of the written instructions had been read to the jury. We concede that most instances of prejudicial error under § 25-1115 have occurred after the jury had begun its deliberations, but § 25-1115 is not expressly limited to instructions given during deliberations. In the instant case, we believe the critical factors are that the instruction was given after the written jury instructions had already been read to the jury and that the language of the instruction could reasonably be understood by the average juror as modifying the court's earlier written instruction on the critical issue of self-defense. It naturally follows that the jury, when later instructed in a conflicting manner, could be confused. Obviously, the purpose of § 25-1115 is to avoid such confusion.

It may be that the instant case demonstrates the wisdom of the pattern jury instruction, including the optional language, which contemplates that the instructions will be read to the jury after the closing arguments of the parties or counsel. See NJI2d Crim. 9.1 ("[m]embers of the jury, now that you have heard all of the evidence [and the arguments of counsel] it is my duty to instruct you in the law").

■ The subsequent arguments of counsel for the State and for Claycamp cannot be viewed as dissolving the prejudice contemplated by § 25-1115. Such an argument would suggest that the jury should equate arguments of counsel with the trial court's instructions on the law. The sole source of law to be considered by the jury comes from the instructions given by the judge. See *State v. Chaney*, 184 Neb. 734, 171 N.W.2d 787 (1969). We conclude that the subsequent arguments of the prosecutor and of defense counsel cannot be viewed as having cured the obvious prejudice flowing from the oral instruction not to consider the victim's conduct, which was the heart of Claycamp's defense.

▮ Having concluded that the district court erred in its instruction to the jury, we must now determine whether such error was harmless. In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id.* Though there was evidence at trial which would support the jury's verdict, we cannot conclude that the jury's verdict was unattributable to the erroneous instruction. We further conclude that there is sufficient evidence upon which a jury could find Claycamp guilty of the charged offenses, and we therefore remand the cause for a new trial. See *State v. Rathjen*, 266 Neb. 62, 662 N.W.2d 591 (2003).

## CONCLUSION

We conclude that the district court erred in giving an oral instruction in direct conflict with the court's earlier written instruction concerning self-defense and that the prejudice flowing from the erroneous instruction requires that the judgment be reversed and the cause be remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.